# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

| | |
|---|---|
| **LETICIA GORDON,** | } |
| **Plaintiff,** | } |
| v. | } Case No.: 6:16-cv-1270-MHH |
| **NANCY A. BERRYHILL,** **Commissioner of the** **Social Security Administration,** | } |
| **Defendant.** | } |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 1383(c), plaintiff Leticia Gordon seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Gordon's claim for supplemental security income. After careful review, the Court affirms the Commissioner's decision.[1]

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. (*See* https://www.ssa.gov/agency/commissioner.html). Therefore, the Court asks the Clerk to please substitute Ms. Berryhill for Carolyn W. Colvin as the defendant in this action. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. Later opinions should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

## I. PROCEDURAL HISTORY

Ms. Gordon applied for supplemental security income on February 19, 2013. (Doc. 6-6, p. 2). Ms. Gordon alleges that her disability began on November 1, 2011. (Doc. 6-6, p. 2). The Commissioner initially denied Ms. Gordon's claim on June 12, 2013. (Doc. 6-5, p. 3). Ms. Gordon requested a hearing before an Administrative Law Judge (ALJ). (Doc. 6-5, p. 10). The ALJ issued an unfavorable decision on March 19, 2015. (Doc. 6-3, pp. 17-34). On July 11, 2016, the Appeals Council declined Ms. Gordon's request for review (Doc. 6-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 1383(c).

## II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir.

2004). In making this evaluation, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If the ALJ's decision is supported by substantial evidence, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III. SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant

can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Gordon has not engaged in substantial gainful activity since February 7, 2013, the application date. (Doc. 6-3, p. 23).[2] The ALJ determined that Ms. Gordon suffers from the following severe impairments: aortic aneurysm, chronic obstructive pulmonary disease or COPD, obesity, depression, anxiety, migraines, and a superior labral tear from anterior to posterior left shoulder. (Doc. 6-3, p. 23). Based on a review of the medical evidence, the ALJ concluded that Ms. Gordon does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 6-3, p. 27).

Next, the ALJ examined Ms. Gordon's residual functional capacity in light of her impairments. The ALJ determined that Ms. Gordon has the RFC to perform:

> light work as defined in 20 CFR 416.967(b), which allows for occasional stooping or crouching; no climbing; no unprotected heights; no left upper extremity pushing/pulling or overhead reaching; no concentrated exposure to pulmonary irritants, dusts, fumes, and gases. [Ms. Gordon] is also limited to simple, non-complex tasks.

---

[2] The ALJ's decision states that Ms. Gordon "protectively filed an application for supplemental security income" on February 7, 2013. (Doc. 6-3, p. 21). Ms. Gordon's application for benefits is dated February 19, 2013. (Doc. 6-6, p. 2). This discrepancy is immaterial to the Court's analysis.

4

(Doc. 6-3, p. 28). Based on this RFC, the ALJ concluded that Ms. Gordon is unable to perform her past relevant work as a sewing machine operator, cashier, and fast food or pizza worker. (Doc. 6-3, p. 32). Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Ms. Gordon can perform, including inspector, assembler, and ticket seller or ticket taker. (Doc. 6-3, pp. 32-33). Accordingly, the ALJ determined that Ms. Gordon has not been under a disability within the meaning of the Social Security Act. (Doc. 6-3, pp. 33-34).

## IV. ANALYSIS

Ms. Gordon argues that she is entitled to relief from the ALJ's decision because the ALJ erred in finding that Ms. Gordon does not meet or equal Listing 4.10.[3] If a claimant establishes that an impairment meets or equals a listed impairment, then the claimant demonstrates that she is disabled. *See Wilbon v. Comm'r of Soc. Sec.*, 181 Fed. Appx. 826, 827 (11th Cir. 2006). "To meet a Listing, a claimant must have a diagnosis included in the Listings and must provide

---

[3] At the end of her brief, Ms. Gordon states that the "ALJ's conclusion that she can return to work at [a] light or sedentary level is not supported by substantial evidence." (Doc. 11, p. 14). Ms. Gordon does not cite specific evidence or authority to support this argument. Therefore, the Court does not consider this argument as part of Ms. Gordon's appeal. *See Morrison v. Comm'r of Soc. Sec.*, 660 Fed. Appx. 829, 832 (11th Cir. 2016) ("To preserve an issue for appeal, the party must raise the specific issue to the district court" which generally "means that the issue must be plainly and prominently raised, with supporting argument and citations to the evidence and to relevant authority.") (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (internal quotation marks and citation omitted).

medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Davenport v. Astrue*, 403 Fed. Appx. 352, 353 (11th Cir. 2010) (internal quotation marks and citations omitted). "To 'equal' a Listing, the medical findings must be at least equal in severity and duration to the listed findings." *Davenport*, 403 Fed. Appx. at 353 (internal quotation marks and citations omitted). "If a claimant has more than one impairment, and none meets or equals a listed impairment, the Commissioner reviews the impairments' symptoms, signs, and laboratory findings to determine whether the combination is medically equal to any listed impairment." *Davenport*, 403 Fed. Appx. at 353 (internal quotation marks and citation omitted).

Listing 4.10 concerns aneurysms. To satisfy Listing 4.10, a claimant must show:

> [a]neurysm of aorta or major branches, due to any cause (e.g., atherosclerosis, cystic medial necrosis, Marfan syndrome, trauma), demonstrated by appropriate medically acceptable imaging, with dissection not controlled by prescribed treatment (see 4.00H6).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.10. Section 4.00H6 provides, in relevant part:

> When does an aneurysm have "dissection not controlled by prescribed treatment," as required under 4.10? An aneurysm (or bulge in the aorta or one of its major branches) is dissecting when the inner lining of the artery begins to separate from the arterial wall. We consider the dissection not controlled when you have persistence of chest pain due to progression of the dissection, an increase in the size of the aneurysm, or compression of one or more branches of the aorta

6

supplying the heart, kidneys, brain, or other organs. An aneurysm with dissection can cause heart failure, renal (kidney) failure, or neurological complications. If you have an aneurysm that does not meet the requirements of 4.10 and you have one or more of these associated conditions, we will evaluate the condition(s) using the appropriate listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00H6.

In this case, the ALJ found that:

[t]he evidence of record does not contain any diagnostic findings, signs, symptoms, or laboratory results that meet or equal any of the listed impairments. Additionally, there are no opinions in the record from medical experts or any other type of medical or psychological consultants, who have been designated by the Commissioner, which indicate that [Ms. Gordon's] impairments, alone or in combination, meet or equal a listing.

(Doc. 6-3, p. 27). The ALJ did not specifically discuss Listing 4.10, but the ALJ's examination of the record demonstrates that the ALJ implicitly found that Ms. Gordon does not meet or equal Listing 4.10. *See Flemming v. Comm'r of Soc. Sec. Admin.*, 635 Fed. Appx. 673, 676 (11th Cir. 2015) ("While the ALJ is required to consider the Listing of Impairments in making a decision at step three, we do not require an ALJ to 'mechanically recite' the evidence or listings []he has considered. . . . Therefore, in the absence of an explicit determination, we may infer from the record that the ALJ implicitly considered and found that a claimant's disability did not meet a listing.") (quoting *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986)).

Ms. Gordon initiated treatment with Dr. Robert Long on January 4, 2013. (Doc. 6-8, p. 19). Ms. Gordon complained of abdominal, pelvic, back, and side pain. (Doc. 6-8, p. 19). A CT scan of Ms. Gordon's abdomen revealed an "[a]nterior abdominal wall hernia containing fat only" and an aneurysm measuring 4.6 centimeters in diameter. (Doc. 6-8, p. 21). A CT scan of Ms. Gordon's pelvis revealed fibroid changes to her uterus but no acute intrapelvic abnormality. (Doc. 6-8, p. 22). Dr. Long diagnosed a recurrent epigastric hernia and general abdominal pain. (Doc. 6-8, p. 19).

Ms. Gordon saw Dr. Long for a follow-up visit on January 11, 2013. (Doc. 6-8, p. 18). Ms. Gordon still was experiencing abdominal and left flank pain. (Doc. 6-8, p. 18). Dr. Long diagnosed an epigastric and umbilical hernia, epigastric pain, and a uterine mass. (Doc. 6-8, p. 18). Dr. Long stated that Ms. Gordon needed beta blockers for her aneurysm. (Doc. 6-8, p. 18).

On January 30, 2013, Ms. Gordon saw Dr. Jonathan Smith for gastrointestinal bleeding. (Doc. 6-8, p. 32). Ms. Gordon also complained of dysphagia. (Doc. 6-8, p. 32). Ms. Gordon denied weight loss. (Doc. 6-8, p. 32). Ms. Gordon did not complain of chest pain, and a cardiovascular examination was normal. (Doc. 6-8, p. 33). Ms. Gordon's abdomen was "soft, nontender, [and] nondistended," but there was a "palpable bulge superior to [Ms. Gordon's] umbilicus." (Doc. 6-8, p. 33). Ms. Gordon's back had no masses, step offs, or

8

tenderness. (Doc. 6-8, p. 34). Dr. Smith diagnosed a gastrointestinal hemorrhage, aortic aneurysm, and a ventral hernia. (Doc. 6-8, p. 34). Dr. Smith recommended an "EGD and colonoscopy to determine the source of [Ms. Gordon's] symptoms." (Doc. 6-8, p. 34). Dr. Smith's notes state that he would refer Ms. Gordon "to CT surgery for aortic root aneurysm." (Doc. 6-8, p. 34).

A February 5, 2013 endoscopy and colonoscopy revealed "mild esophagitis, possible early esophageal stricture, type 1 hiatal hernia, duodenitis with ulceration[,] and [a] colon polyp." (Doc. 6-8, p. 35).

On February 21, 2013, Dr. W. Ford Simpson evaluated Ms. Gordon for "an ascending thoracic aneurysm." (Doc. 6-8, p. 27). Dr. Simpson noted that Ms. Gordon:

> is 52 years old and has had recent abdominal pain with aching, burning, pulling in the bust line, with moderate discomfort associated with left chest pain and left shoulder/arm pain. The pain is worse with activity. It has gotten worse over the last 6 to 12 months. It occurs on a daily basis. Resting and medication makes it feel somewhat better but she is sore all over. She has never been told that she has high blood pressure. She has no family history of aortic problems to her knowledge.

(Doc. 6-8, p. 27). A cardiovascular exam revealed "[r]egular rate and rhythm without murmurs, gallops, or rubs." (Doc. 6-8, p. 28). Ms. Gordon's blood pressure was 140/100. (Doc. 6-8, p. 28). Dr. Simpson diagnosed a "4.5 cm ascending aortic aneurysm at the aortic root." (Doc. 6-8, p. 28). Dr. Simpson stated that Ms. Gordon "does not have any murmur compatible with aortic

insufficiency." (Doc. 6-8, p. 28). Dr. Simpson recommended that Ms. Gordon return to her treating physician "to begin beta-blocker therapy given her aneurysmal involvement of her ascending aorta" and her "moderate diastolic hypertension." (Doc. 6-8, p. 28). Dr. Simpson planned to repeat a CT scan of Ms. Gordon's chest in six months "to more fully evaluate . . . her rather large thoracic aneurysm given her young age." (Doc. 6-8, p. 28).

A February 26, 2013 CT scan revealed a "[m]ild aneurysmal dilatation of the ascending thoracic aorta with the greatest AP diameter measuring 4.9 [centimeters]." (Doc. 6-8, p. 30). The scan did not show "mediastinal or hilar adenopathy." (Doc. 6-8, p. 30).

On March 12, 2013, Dr. Smith performed surgery on Ms. Gordon to repair her ventral hernia. (Doc. 6-8, p. 68). During a post-surgery follow up visit with Dr. Smith on March 25, 2013, Ms. Gordon was "doing well" and had no complaints. (Doc. 6-8, p. 70). Her abdomen was soft, nontender, and nondistended. Ms. Gordon's surgical wound was "healing well," and there was "[n]o evidence of recurrent hernia." (Doc. 6-8, p. 70). Dr. Smith advised Ms. Gordon not to engage in heavy lifting or strenuous activity for six weeks. (Doc. 6-8, p. 70).

On April 18, 2013, Ms. Gordon saw Dr. Long for mood swings and stomach gurgling. (Doc. 6-8, p. 81). Ms. Gordon also complained of shortness of breath,

palpitation, chest pain, diarrhea, constipation, incontinence, headaches, tailbone pain, swelling, numbness in her left arm, depression, anxiety, and insomnia. (Doc. 6-8, p. 81). Dr. Long stated that Ms. Gordon "[h]as an aneurysm coming off her heart, causing blood pressure issues." (Doc. 6-8, p. 81). Dr. Long diagnosed mild hypertension, obesity, a 4.5 centimeter ascending aortic aneurysm, a possible uterine mass, depression, and headaches. (Doc. 6-8, p. 81).

On May 2, 2013, Ms. Gordon was admitted to the emergency room at Fayette Medical Center. (Doc. 6-9, p. 3). Ms. Gordon complained of chest pain radiating down her left arm and into her back. (Doc. 6-9, p. 3). Ms. Gordon's blood pressure was 128/93. (Doc. 6-9, p. 6). A cardiovascular exam revealed "regular rate/rhythm, no edema, no gallop, no JVD, no murmur, [and] normal peripheral pulses." (Doc. 6-9, p. 6). Ms. Gordon had tenderness over the right anterior chest wall, but chest x-rays were negative. (Doc. 6-9, p. 13). Ms. Gordon had normal breath sounds, and she was not in respiratory distress. (Doc. 6-9, p. 6). An EKG was normal. (Doc. 6-9, pp. 6, 13). Doctors diagnosed chest wall pain, hypertension, and generalized anxiety. (Doc. 6-9, p. 12). Doctors discharged Ms. Gordon in "good" condition on her regular medications. (Doc. 6-9, p. 14).

A June 17, 2013 x-ray of Ms. Gordon's chest showed that Ms. Gordon's heart size was normal, and there was no evidence of acute infiltrate, atelectasis, or

effusion. (Doc. 6-9, p. 38). Doctors found "[n]o acute abnormality" in Ms. Gordon's chest. (Doc. 6-9, p. 38).

On July 11, 2013, Ms. Gordon saw Dr. Simpson "following [a] CT chest [scan] that show[ed] [a] stable ascending aortic aneurysm measuring 4.6 [centimeters] in diameter." (Doc. 6-9, p. 33). Ms. Gordon still experienced "chest pain primarily on the left side radiating in the left arm." (Doc. 6-9, p. 33). Dr. Simpson reviewed Ms. Gordon's most recent CT scan and determined that her "stable thoracic aortic aneurysm . . . would not be the source of her discomfort." (Doc. 6-9, p. 33).[4] Dr. Simpson stated that "[i]t seems more likely that she has rotator cuff or some type of neurogenic component to her pain." (Doc. 6-9, p. 33). Dr. Simpson explained that he would see Ms. Gordon again in one year with a follow up CT scan of her chest. Dr. Simpson also noted that Ms. Gordon had a 3 millimeter lung lesion "to the right middle lobe which will need to be followed." (Doc. 6-9, p. 33).

A July 23, 2013 CT scan showed a "small ascending aortic aneurysm measuring 5 [centimeters] in greatest diameter" with mild dilatation. (Doc. 6-9, p. 34). Ms. Gordon's "aorta return[ed] to normal diameter in the arch and descending aorta [was] within normal limits." (Doc. 6-9, p. 34). The CT scan showed "[n]o

---

[4] Citing her testimony in the administrative hearing, Ms. Gordon stated in her brief to this Court that the aortic aneurysm causes chest pain. (Doc. 11, p. 2) (citing Doc. 6-3, p. 46). The ALJ correctly found that Ms. Gordon's medical records contradict this assertion. (Doc. 6-3, p. 30).

other significant findings in the mediastinum." (Doc. 6-9, p. 34). The CT scan revealed "small nodular densities . . . within the lungs." (Doc. 6-9, p. 34).

On November 26, 2013, Ms. Gordon went to the emergency room at Fayette Medical Center complaining of head pain that she had experienced for about a month. (Doc. 6-9, p. 41). Ms. Gordon's neck was tender, and mild rhonchi were present. (Doc. 6-9, p. 44). Ms. Gordon reported no cardiovascular symptoms, and a cardiovascular exam was normal. (Doc. 6-9, pp. 43-44). Ms. Gordon had non-tender extremities with full range of motion. (Doc. 6-9, p. 44). Doctors diagnosed a muscle tension headache and discharged Ms. Gordon in stable condition. (Doc. 6-9, p. 45).

The medical evidence demonstrates that doctors diagnosed Ms. Gordon with an aortic aneurysm between 4.5 and 5 centimeters in diameter. (Doc. 6-8, pp. 21, 28, 30, 81; Doc. 6-9, pp. 33-34). But the medical evidence contains no information indicating that the inner lining of Ms. Gordon's artery has begun to separate from her arterial wall. Therefore, Ms. Gordon has not established that her aneurysm has dissection, a factor which the regulations require Ms. Gordon to prove to meet Listing 4.10. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 4.00H6, 4.10. Accordingly, Ms. Gordon has not demonstrated that she meets Listing 4.10. *See Perkins v. Comm'r of Soc. Sec. Admin.*, 533 Fed. Appx. 870, 872 (11th Cir. 2014) (to meet a Listing, "the claimant must meet all of the specified medical criteria,

and an impairment that fails to do so does not qualify no matter how severely it meets some of the criteria.") (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)); *Rodriguez v. Astrue*, 2010 WL 5677696, at *6 (S.D. Fla. Nov. 19, 2010) (claimant did not meet Listing 4.10 because "a review of the diagnostic testing reveal[ed] no evidence of dissection").

Ms. Gordon contends that even if her aneurysm does not meet Listing 4.10, her combination of impairments is severe enough to preclude substantial gainful activity. (Doc. 10, p. 13). Ms. Gordon's argument is not persuasive. The ALJ adequately considered the combined effects of Ms. Gordon's impairments by stating that "[Ms. Gordon] has no impairment or combination of impairments, which meets or equals the criteria of any of the listed impairments described in Appendix 1 of the Regulations." (Doc. 6-3, p. 27); *see Wilson v. Barnhart*, 284 F.3d 1219, 1224-25 (11th Cir. 2002) (ALJ's statement that the claimant did not have an impairment or combination of impairments that meets or medically equals a listing "constitutes evidence that [the ALJ] considered the combined effects of [the claimant's] impairments").

In support of her argument that her aneurysm, in combination with her other impairments, meets a listing, Ms. Gordon cites *Wilson v. Schweiker*, 553 F. Supp. 728 (E.D. Wash. 1982). (*See* Doc. 11, pp. 10-11, 13). *Wilson* is distinguishable from Ms. Gordon's case.

In *Wilson*, the district court found that substantial evidence did not support the ALJ's determination that the claimant's aneurysm did not meet the requirements for Listing 4.11(A).[5] The district court explained:

> The aneurysm meets the Appendix I requirement since it cannot be surgically repaired because of plaintiff's other medical conditions. The medical reports indicate that it should be repaired in the future (at least before it ruptures). Thus, the record shows that death is almost certain if the aneurysm is not repaired; yet surgery cannot be scheduled during the foreseeable future.

*Wilson*, 553 F.Supp. at 735. In reaching this conclusion, the district court relied on medical evidence demonstrating that the claimant's aneurysm had increased in size from five to eight centimeters over the course of two years. *Wilson*, 533 F. Supp. at 735. The district court also explained that the claimant's treating physician advised that the aneurysm required surgery "before it spontaneously rupture[d]," but doctors concluded that surgery was "inadvisable because of intervening problems." *Wilson*, 533 F. Supp. at 735.

In reversing the ALJ's decision, the district court noted that the claimant's combined impairments prevented the claimant from engaging in substantial gainful activity. The district court stated:

> [e]ven if reasonable minds could disagree as to whether plaintiff's aneurysm fits into Appendix I, the undisputed medical evidence shows many unrelated impairments *in combination* are severe enough to preclude the plaintiff from doing substantial gainful activity.

---

[5] Listing 4.11(A) is now Listing 4.10.

> Substantial evidence does not exist in the record for concluding otherwise.

*Wilson*, 553 F.Supp. at 735 (emphasis in *Wilson*). To support this conclusion, the court relied on diagnosed impairments including arthritis with a long history of back pain, degenerative joint disease with sciatica, atherosclerotic heart disease with bouts of atrial fibrillation and tachycardia that required electrocardioversion, renal cysts, ulcerative colitis, chronic obstructive pulmonary disease causing shortness of breath with moderate activity, and a growing aortic aneurysm for which surgery was required within the year "to avoid spontaneous rupture." *Wilson*, 553 F.Supp. at 731. The district court also found that the ALJ "dismissed two treating physicians' characterizations of the plaintiff's disability as total and permanent with regard to any type of employment." *Wilson*, 553 F.Supp. at 736.

The medical evidence in this case differs from the evidence before the district court in *Wilson*. Between January 2013 and July 2013, Ms. Gordon's aneurysm grew only half of a centimeter. On July 11, 2013, Dr. Simpson reviewed Ms. Gordon's most recent CT scan and determined that her aneurysm was stable and was not the source of her discomfort. (Doc. 6-9, p. 33). During her administrative hearing, Ms. Gordon testified that doctors told her that they would like to do surgery on her aneurysm "sooner or later," but they did not want to perform the surgery "right now." (Doc. 6-3, pp. 46, 52). The medical records do not suggest that Ms. Gordon's physicians delayed surgery on Ms. Gordon's

aneurysm because of her other impairments. In fact, doctors performed surgery on Ms. Gordon's hernia, and she underwent an endoscopy and a colonoscopy. In addition, although Ms. Gordon testified during the administrative hearing that her doctors told her "not to exert herself because 'getting wore out, exerted, upset or anything like that would cause [her] aneurysm to burst or something'" (Doc. 11, p. 11) (quoting Doc. 6-3, p. 48), the medical evidence does not demonstrate that Ms. Gordon's doctors were concerned that her aneurysm likely would rupture spontaneously. Moreover, except for the six week period following her hernia surgery, doctors did not recommend that Ms. Gordon limit her physical activity or work, and no treating physician or other medical source opined that Ms. Gordon's aneurysm or other impairments were disabling. Thus, the Court finds that *Wilson* is not analogous to Ms. Gordon's case.

The ALJ thoroughly reviewed the medical evidence (Doc. 6-3, pp. 24-26), and substantial evidence supports the ALJ's implicit finding that Ms. Gordon's aneurysm, alone or in combination with her other impairments, does not meet or medically equal Listing 4.10.

## V. CONCLUSION

For the reasons discussed above, the Court finds that the ALJ's decision is supported by substantial evidence, and the ALJ applied proper legal standards. The Court will not reweigh the evidence or substitute its judgment for that of the

Commissioner. Accordingly, the Court affirms the Commissioner. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this August 31, 2017.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE